**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TEXAS INTERNATIONAL PROPERTY ASSOCIATES,** | § § § | |
| **Plaintiff,** | § § | **CIVIL ACTION NO.** |
| **vs.** | § § | |
| **UNITED CONSUMERS CLUB, INC.** | § § | **3:07-CV-1769-N** |
| **Defendant.** | § § | **ECF** |

---

# PLAINTIFF'S RESPONSE TO MOTION
# TO DISMISS OR TRANSFER VENUE

---

Respectfully submitted,

SHRULL ALTMAN LLP

**Daniel G. Altman**
Texas Bar No. 00793255
1701 River Run Drive, Suite 1116
Fort Worth, Texas 76107
(817) 336-3925
(871) 336-2124 (FAX)

**Attorney for Plaintiff
Texas Intern'l Property Assoc.**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................... 1

    A.      The Parties ............................................................................................ 1

    B.      Procedural History ............................................................................... 5

III.    ARGUMENTS AND AUTHORITIES ............................................................ 7

    A.      Plaintiff does not seek a declaratory judgment under federal law
        so abstention in this action is not warranted .................................... 7

    B.      TIPA'S Petition adequately states claims under state law ........................... 14

        i.      Dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or analogous
            Texas standards is not favored ........................................... 14

        ii.     Either Defendant's Motion to Dismiss or Notice of
            Removal is frivolous ..................................................... 14

        iii.    Plaintiff's petition states an actionable claim under
            Texas law ................................................................... 16

    C.      Venue is not proper in Indiana and the case should not be transferred. ........ 16

III.    CONCLUSION AND PRAYER ...................................................................... 19

SIGNATURE BLOCK .............................................................................................................. 19

CERTIFICATE OF SERVICE .................................................................................................. 20

## TABLE OF AUTHORITIES

**FEDERAL CASES:**

*American Girl, LLC v. Nameview, Inc.,* 381 F.Supp.2d 876 (E.D. Wis. 2005)........................ 8

*Bank One, N.A. v. Euro-Alamo Investments, Inc.,* 211 F.Supp.2d 808 (N.D.Tex.2002)......... 17

*Bass v. Elliot,* 71 F.R.D. 693 (E.D.N.Y. 1976) ........................................................ 15

*Bell Atlantic v. Twombly,* 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). ........................... 14

*Bord v. Banco de Chile,* 205 F.Supp.2d 521 (E.D. Va. 2002).................................................. 8

*BroadBridge Media, LLC v. Hypercd.com,* 106 F.Supp.2d 505 (S.D.N.Y. 2000).................... 9

*Eastman Medical Products, Inc. v. E.R. Squibb & Sons, Inc.,*
     199 F.Supp.2d 590 (N.D.Tex.2002). ........................................................ 17

*Goldstein v. Gordon,* 2002 WL 324289  (N.D.Tex. 2002)..................................................... 19
*Herron v. Continental Airlines, Inc.,* 73 F.3d 57 (5th Cir. 1996)............................................ 15

*Illinois Union Insurance Company v. Tri Core Inc.,*
     191 F.Supp.2d 794 (N.D.Tex.2002) ........................................................ 17

*In re Hot-Hed Inc.,* 477 F.3d 320 (5th Cir. 2007) .................................................... 13

*In re Larry Koenig & Assoc.,* LLC, 2004 WL 3244582 (M.D.La. 2004) .............................. 16

*In re Volkswagen AG,* 371 F.3d 201 (5th Cir.2004) (per curiam)............................................ 17

*Kremen v. Cohen,* 337 F.3d 1024 (9th Cir. 2003) ........................................................ 16

*Lowrey v. Texas A&M University System,* 117 F.3d 242, (5th Cir. 1997)............................... 14

*Mann v. AFN Investments, Ltd.,* 2007 WL 2177030 (S.D.Cal. 2007)..................................... 13

*Mattel, Inc. vs. Barbie-Club.Com,* 310 F.3d 293 (2nd Cir. 2002)........................................... 16

*Meehan v. United Consumers Club Franchising Corp.,* 312 F.3d 909 (8th Cir.2002) ............. 3

*M/S Bremen v. Zapata Off-Shore Co.,* 92 S.Ct. 1907 (1972) .................................................. 18

*Network Solutions, Inc. v. Umbro Intern., Inc.,*
     259 Va. 759, 529 S.E.2d 80 (Va. 2000) ........................................................ 16

*Nurseminders of Elmwood Park, Inc. v. Metropolitan Life,* 109 F.R.D. 4
     (N.D. Ill. 1985)........................................................ 15
.
*Parisi v. NetLearing, Inc.* 139 F.Supp.2d 747 (E.D. Va. 2001) .......................................... 8, 9

*Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14 (1st Cir. 2001) ............................... 9

*Security Center, Ltd. v. First Nat'l Security Centers,* 750 F.2d 1295 (5th Cir. 1985) ............. 18

*Smallwood v. Illinois Central R.R. Co.,* 385 F.3d 568, *576* (5th Cir. 2002) ........................... 15

*South Bend Consumers Club, Inc. v. United Consumers Club, Inc.,*
    742 F.2d 392 (7th Cir.1984) .................................................................................... 3

*Stachon v. United Consumers Club, Inc.,* 229 F.3d 673 (7th Cir.2000) ................................... 3

*Stewart Org., Inc. v. Ricoh Corp.,* 108 S.Ct. 2239 (1988). ...................................................... 18

*Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370  (2nd Cir. 2003) ............................................. 8

*United Consumers Club, Inc. v. Bledsoe,* 2007 WL 1749224 (N.D.Ind. 2007) ....................... 3

*Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 308-311 (7th Cir. 1986) .................... 3

*Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786 (5th Cir. 1983) ..................... 18

**STATE CASES:**

*Brown & Bigelow v. Remembrance Advertising Products, Inc.,* 279 A.D. 410,
    110 N.Y.S.2d 441, 92 U.S.P.Q. 443 (1952), *aff'd,* 304 N.Y. 909,
    110 N.E.2d 736, 96 U.S.P.Q. 426 (1953) ................................................................. 14

*Flagship Real Estate Corp. v. Flagship Banks, Inc.,* 374 So.2d 1020
    204 U.S.P.Q. 227 (Fla.App., 1979) ................................................................... 13, 14

*Murray v. Murray,* 515 S.W.2d 387 (Tex.Civ.App. – Waco 1974, no writ) ........................... 16

*Niemiec v. Kellmark Corp.,* 153 Misc.2d 347, 349 581 N.Y.S.2d 569 (1992) ......................... 3

*Nordic Inn Condominium Owners' Ass'n v. Ventullo,* 151 N.H. 571,
    864 A.2d 1079 (N.H. 2004) ..................................................................................... 14

*Small v. Small,* 216 S.W.3d 872, 878 (Tex.App. – Beaumont 2007, n.p.h.) ........................... 16

*United Consumers Club v. Griffin,* 85 Ohio App.3d 210, 212, 619 N.E.2d 489 (1993) .......... 4

**FEDERAL STATUTES:**

15 U.S.C. § 1114(2)(D)(v) ...................................................................................................... 13

15 U.S.C. §1119 ..................................................................................................................... 13

28 U.S.C. § 1404(a) ............................................................................................................... 17

28 U.S.C. § 1447(c)..............................................................................................................15

**SECONDARY AUTHORITY:**

MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ...................................................13

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TEXAS INTERNATIONAL PROPERTY** | § | |
| **ASSOCIATES,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.** |
| | § | |
| **vs.** | § | |
| | § | **3:07-CV-1769-N** |
| **UNITED CONSUMERS CLUB, INC.** | § | |
| | § | **ECF** |
| **Defendant.** | § | |

## PLAINTIFF'S RESPONSE TO MOTION TO DISMISS OR TO TRANSFER VENUE

Plaintiff Texas International Property Associates ("TIPA"), by and through its attorney, Daniel G. Altman, hereby responds to Defendant United Consumer Club, Inc.'s Motion to Dismiss or to Transfer Venue and for such would state as follows:

## I. INTRODUCTION

1.      This dispute concerns a dispute over the domain name <directbuymembers.com> which is governed by the Uniform Domain Name Dispute Resolution Policy (UDRP) and a *de novo* appeal of the panelists ruling to the state court to reconsider the contractual criteria related to TIPA's registration of the domain name. Under no circumstances does it involve a more traditional "trademark infringement" action under the Lanham Act as Defendant now disingenuously argues in order to avoid the forum selection clause it agreed to six months ago as a condition to filing the UDRP complaint.

## II. STATEMENT OF FACTS

**A.      The Parties**

2.      Texas International Property Associates, as the lawfully registered d/b/a of Dauben, Inc.,[1] is the registrant of hundreds of thousands of the domain names, which are, in general, generic and descriptive terms such as such as <coolwritings.com>, <topairguns.com>, <indianloves.com>,

---

[1] Strangely for a company that has changed it corporate identity so often, apparently to avoid the consequences of bad press, UCC seems to imply there is something wrongful about using a lawfully registered fictitious business name. There is not.

*TIPA v. UCC.*: Response to Motion to Dismiss or Transfer Venue – Page 1 of 20

<dailychampion.com>, <mastermasonstore.com>, and <juicymiami.com> in English, or <aeropuertosdelmundo.com>, <espanol2.com>, and <puertoricorecetas.com> in Spanish, as well as typos of such generic terms as <bankratae.com>, <violns.com>, <topdownlod.com> and <georgeousredhead.com>. Because nearly every word in the English language is trademarked for something,[2] TIPA finds itself embroiled in legal disputes wherein an overreaching trademark holder makes the claim that a generic, descriptive or even more laughably arbitrary mark absolutely prevents all parties from registering domain names consisting of the word component of those marks.

    3.    Generally, these complainants initiate proceedings under the Uniform Domain Name Dispute Resolution Policy, a contractual proceeding mandated by the ICANN (the non-governmental organization which governs the Internet) upon every domain name registrant. The complainant controls the selection of the panel by its choice of forum. The two major forums in the .com UDRP disputes, WIPO and the NAF, market themselves exclusively to complainants by advertising their eagerness to take domain names away from domain name holders and give them to alleged trademark holder complainants. See "WIPO Responds To Significant Cybersquatting Activity In 2005" (January 25, 2006)[3] and "Domain dispute resolution program helps intellectual property owners protect their online property" (February 23, 2006).[4] These pressures have lead to heavily biased results in favor of complainants (i.e., trademark holders), as at least three published studies have found. *See* Geist, Michael, "Fair.com?: An Examination of the Allegations of Systemic Unfairness in the ICANN UDRP" (Aug. 2001)[5]. Geist, Michael, "Fundamentally Fair.com? An Update on Bias Allegations and the ICANN UDRP;"[6] and Mueller,

---

[2] By way of demonstrative example, TIPA has attached a copy of the top front page of the Dallas Morning News from December 2, 2007 (Appendix, pp. 322). The words that are crossed out are words for which a federally registered trademark exists or has existed for that word alone, whereas those that are merely highlighted are words that are part of a trademarked combination of words. Following that is a list of the trademarked terms and words with the second column indicating the serial number and the total number of registrations and applications of that word (Appendix, pp. 323-24). Ironically, as Defendant cites the biased DMN article regarding TIPA (the reporter called the evening before the evening before the story ran), the Dallas Morning News itself is liable for infringing upon SPORTSDAY to describe its sports section and cybersquatting on the mark DALLAS NEWS CHANNEL bt registering the domain name <dallasnews.com> (See Appendix, pp. 325-328).
[3] http://www.wipo.int/edocs/prdocs/en/2006/wipo_pr_2006_435.html
[4] http://www.pr.com/press-release/29349
[5] http://aix1.uottawa.ca/~geist/geistudrp.pdf .
[6] http://aix1.uottawa.ca/~geist/fairupdate.pdf

Milton, "Rough Justice: An Analysis of ICANN's Uniform Dispute Resolution Policy" (Nov. 2000).[7]
Notwithstanding this bias, TIPA had prevailed in several of these proceedings and has successfully
overturned the UDRP decision in the only case that has gone to trial, when a jury returned a unanimous
verdict in favor of TIPA against a large company represented by a large local law firm (Appendix, p.
329).

    4.      For all its mud-slinging against TIPA – which constitutes the bulk of its unfounded
motion – UCC operates a highly infamous and disreputable business that has resulted in a number of high
profile lawsuits brought by customers and its franchisees, which have included allegations of deceit,
fraud, corruption, untruthfulness and racketeering across the nation. *United Consumers Club, Inc. v.
Bledsoe,* 2007 WL 1749224 (N.D.Ind. 2007) (lawsuit with franchisees); *Meehan v. United Consumers
Club Franchising Corp.,* 312 F.3d 909 (8th Cir.2002) (fraud and deceptive practice brought against
UCC); *Stachon v. United Consumers Club, Inc.,* 229 F.3d 673 (7th Cir.2000) (RICO action brought
against UCC by customers), *Walton v. United Consumers Club, Inc.,* 786 F.2d 303, 308-311 (7th Cir.
1986) (violations of Fair Labor Standards Act); *South Bend Consumers Club, Inc. v. United Consumers
Club, Inc.,* 742 F.2d 392 (7th Cir.1984) (granting partial summary judgment against UCC for anti-trust
violations). For example, a search of PACER shows that UCC has been involved in numerous federal
lawsuits in Missouri, North Carolina, Georgia, Louisiana, Washington, California, Florida, Washington in
the last decade (Appendix pp. 297-300). One court went so far as to find  UCC's standard contract and
business model void as unconscionable, stating:

> Buyers may recover, however, since this Club membership is nothing more than a
> cleverly disguised method of selling nothing but hopes and dreams. How much
> merchandise must be purchased at the Club's "low prices" before the member gets his
> money's worth for the two year membership fee? The Court suggests that the answer to
> that question is: too much. And with that answer, the inescapable legal conclusion is that
> the contract is grossly unconscionable.

*Niemiec v. Kellmark Corp.,* 153 Misc.2d 347, 349 581 N.Y.S.2d 569, 570 (1992). UCC has been the
subject to repeated complaints online and a Google Search for its name turns up numerous hits of

---

[7] http://www.acm.org/usacm/IG/roughjustice.pdf

negative comments on the "Rip Off Report" and other gripe sites (Appendix pp. 303-312).  Just last year, the company was the subject of a critical television report detailing investigations into deceptive practices and overpricing (Exhibit  314-15).[8]

5.       Schooled in such high pressure sales tactics, UCC has demonstrated an amazing capacity for speaking out of both sides of its mouth in litigation. IN seeking to prevail in the UDRP and establish TIPA's knowledge of the mark, UCC boasted of its nationwide reach and its extensive marketing campaign kicked off in Dallas, Texas, but in its Indiana court filings it argues that it is a uniquely Indiana based company, comparing itself to the Indianapolis Colts NFL team. In this case, it denied maintaining offices or otherwise operating in any State outside of Indiana, yet it files lawsuits in other jurisdictions. In other pleadings and in court testimony its officers have claimed to be nationwide operation. *United Consumers Club v. Griffin,* 85 Ohio App.3d 210, 212, 619 N.E.2d 489, 490 (1993) ("For its case, the Club presented the testimony of its Vice President, Raymond Schoenfeld. Schoenfeld testified that the Club is a nationwide buyers' club which sells various products to its members at discounted prices"); Motion for Preliminary Injunction against PrimeTime pp. 4-5 (claiming to air infomercials which can be seen in "virtually all States and Provinces"). Likewise, in this case, it claims that "direct buy" is highly distinctive, but made contrary statements in the USPTO proceedings in order to demonstrate that it and a prior user could make equal use of the mark.  Even in the proceedings before this court, UCC sought removal on the basis that the TIPA's petition raised a federal question six weeks ago, but now has filed this motion arguing that the case must be dismissed for not stating a federal claim.

6.       Finally, one must mention the thousands of other potential "parties" that use "direct buy" in connection with membership services. This usage was repeatedly pointed out to UCC by the United States Patent and Trademark ("USPTO"), which denied the initial application (Appendix pp. 150-187) Yet, apparently desperate to shed the bad will associated with the name "United Consumers Club," UCC persisted forward with its application.  Upon publication, the mark was immediately challenged by another company in the Midwest using the same name in a nearly identical font to describe a similar

---

[8] Streaming video available at http://wcbstv.com/seenat11/DirectBuy.BJ.s.2.235142.html .

business operation (Appendix, p 259). The parties reached an undisclosed settlement but others continue to use "direct buy" to describe membership and non-membership programs to allow consumers to purchase direct from manufacturers (Appendix, pp. 308-312). Examples include Ticket Networks Direct Buy Tickets, Helmetdirect.com's "buy direct and save," Chinatronic's "direct buy cheap China mobile phones," Defense Logistics Agency's "Direct Buy Program" for obtaining aircraft parts, and Export.com's "direct buy" website for Chinese products. *Id.*  Most telling, major retailer Target has a sponsored listing with Google for "Direct Buy at Target" which links to a list of items for sale with "direct" in the title, none of which have any relation to UCC (Appendix p. 313). Other direct competitors use the words "direct buy" to describe their membership services, such as RockBottomPrices.com, whose video describes the website as a "direct buying discount website" that promises its "members unlimited access to insider's pricing" (Appendix pp. 316-318).[9]  Tellingly, UCC hasn't gone after these potential parties. Instead, it has targeted a company operating solely in Texas which has the thing that UCC covets – the domain name <directbuymembers.com>., which was registered two years ago, at a point in time when no party had exclusive rights to the disputed term "direct buy," as UCC itself argued in opposition to the challenge to its registration (Appendix pp. 264-65).

**B.    Procedural History**

7.    Because Defendant conveniently forgets facts when recounting matters to courts (as when it forgot to mention either the UDRP proceeding or the Texas lawsuit when it filed its action in Indiana), it is necessary to rehash the procedural history. This is the first filed court action currently pending between these parties over which should have exclusive rights to the domain name <directbuymembers.com>.

8.    On July 6, 2007, Defendant United Consumers Club, Inc. ("Plaintiff" or "UCC") filed a Complaint attempting to institute an administrative proceeding under the Uniform Dispute Resolution Policy (UDRP), pursuant to rules dictated by the International Corporation for Assigned Names and Numbers (ICANN) on all persons who register or hold a domain name (UDRP Complaint, Appendix pp.

---

[9] Steaming video at http://rockbottomprices.com/ .

87-100).  The dispute arose due to Defendant Texas International Property Associates' ("TIPA") registration of the generic name <directbuymembers.com>, with "direct buy members" being a generic term to describe those who participate in direct buy opportunities. After UCC remedied technical defects in its Complaint, the World Intellectual Property Organization ("WIPO") commenced the action on July 23, 2007 and set August 12, 2007 as the deadline for TIPA to respond to UCC's Complaint in the UDRP proceeding (Notification of Commencement, Appendix pp. 134-138).

9.      In its UDRP Complaint, as required under the rules, UCC consented to jurisdiction in a court of mutual and competent jurisdiction, which stated: "In accordance with Paragraph 3(b)(xiii), the Complainant agrees to submit, only with respect to any challenge that may be made by Respondent to a decision by the Administrative Panel to transfer or cancel the Domain Name subject to this Complaint, to the jurisdiction of the courts in the location of the Registrar BudgetNames.com's office in Texas" (Appendix p. 98-99)

10.     On August 10, 2007, TIPA filed suit against Defendant in the 95th District Court of Dallas County, Texas, seeking declaratory judgment, injunctive relief and damages resulting from UCC's attempts to hijack the domain name <directbuymembers.com> (Original Petition, Appendix pp. 140-146). On August 13, 2007 citation was issued via the Texas Secretary of State, pursuant to sections 17.044 and 17.045 of the Texas Civil Practice & Remedies Code (Appendix p. 111). On September 19, 2007, the Texas Secretary of State forwarded a copy of the citation and Petition to Defendant, via Registered Mail, and it was served on UCC on September 24, 2007 (Appendix p. 149).

11.     Meanwhile, on August 12, 2007, TIPA filed its response in the UDRP proceeding pointing out that no abusive domain name registration could be found because UCC's trademark was registered a year after the registration of <directbuymembers.com> and the United States Patent and Trademark Office ("USPTO") refused to find the mark distinctive because of extensive third-party use (Appendix pp. 103-116).  TIPA referenced the Texas lawsuit and provided a copy of the Original Petition to WIPO and UCC. In contravention of the UDRP Rule 12 (See Appendix p. 60), on August 21, 2007, UCC submitted an additional statement, wherein it effectively conceded that the registration was not as

relevant as *use* and described extensive use in Dallas, Texas as evidence of such use and notice to TIPA:

> Throughout those two-plus years preceding Respondent's registration of the domain name, Complainant [UCC] had been spending millions of dollars running thirty-minute infomercials on major television networks, the purpose of which was to popularize the DIRECTBUY mark and grow the membership of the DIRECTBUY brand buying clubs. . . . The very first place that the infomercials ran was in Respondent's home town, Dallas, Texas in April 2002. The infomercials continued to run in Dallas in 2003 and 2004.

UCC Additional Statement, pp. 3-4 (Appendix pp. 119-120). On August 27, 2007, TIPA filed a sur-reply (Appendix pp. 127-133).

12.     On or about September 15, 2007, TIPA and its president Joseph Dauben were served in the Indiana lawsuit.  Neither of these parties maintain any contacts with Indiana or have a physical presence in Indiana. The only basis for jurisdiction in Indiana rests upon the unilateral decision of UCC to base its home office in Indiana. Despite citing other inadmissible UDRP proceedings against TIPA, UCC's Indiana Complaint was conspicuously silent on the pending UDRP proceeding and the Texas lawsuit (which is also failed to disclose on the cover sheet). TIPA and Dauben timely filed a Motion to Dismiss for Lack of Personal Jurisdiction or to Transfer, the arguments and exhibits which it incorporates herein as if set out in full (Appendix pp. 4-276).

13.     On October 19, 2007, UCC removed the first-filed Texas action from state court to federal court.  TIPA filed a Motion for Remand based in part on the forum selection cause entered into by UCC when it filed its UDRP Complaint. After removing to Federal court, UCC now seeks dismissal of the action on the basis that it does not state federal trademark claim.

### III. ARGUMENTS AND AUTHORITIES

**A.     Plaintiff does not seek a declaratory judgment under federal law so abstention in this action is not warranted**

14.     UCC makes the unfounded argument that this lawsuit was filed in anticipation of a lawsuit involving federal issues. TIPA filed to challenge the *contractual* UDRP asserting claims regarding disputed contract and/or property rights which more readily fall within a state court's general jurisdiction rather than a federal court's limited jurisdiction. Contrary to UCC's implications, the UDRP does not operate under the control of either federal law or the United States government. The only case to

address the issue of government authority over the UDRP expressly held that the United States government is not a party to the UDRP process. *Bord v. Banco de Chile,* 205 F.Supp.2d 521 (E.D. Va. 2002). In *Bord,* a domain name registrant sued the United States Department of Commerce ("DOC") to enjoin the continued use of the UDRP, alleging that it violated the Due Process Clause of the Fifth Amendment, the delegation doctrine, and the Administrative Dispute Resolution Act. *Id.,* at 523. The court dismissed the case for lack of standing because the DOC was not a party to the contract, stating:

> ICANN, the corporation which adopted and requires the UDRP, is a private entity. The registrars that include the UDRP as a part of their registration agreements are private entities. The contract between domain name registrants and the registrars are private contracts. Plaintiff in this case entered into a private contract with a domain name registrar which, in turn, had a private contract with ICANN.

*Id.,* at 524. The court continued on to reject any inference that the government controlled or mandated any result under the UDRP pursuant to the original Memorandum of Understanding, stating:

> The Memorandum between DOC and ICANN does not bind ICANN in any way to commit to a dispute resolution policy, nor does it require ICANN to compel registrants to agree to a dispute resolution policy. Rather, the Memorandum commits ICANN to generally consider trademark issues in determining how disputes should be resolved. Thus, Plaintiff's allegations that the DOC promulgated the UDRP simply cannot be supported by either the Memorandum nor the Policy Statement.

*Id.* As the UDRP is "the result of independent contracts between private entities," the court found the registrant had no standing to bring his claim against the DOC.

15. Other UDRP complainants, when faced with court proceedings, claim that participation in the UDRP process in mandated by some federal statutory or governmental authority. That claim is false. "The UDRP is enforced through contract rather than regulation. Every domain name registrar accredited by ICANN must incorporate the UDRP into each individual name registration agreement." *Parisi v. NetLearing, Inc.* 139 F.Supp.2d 747, 747 (E.D. Va. 2001); *see also Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, n.9 (2nd Cir. 2003) (pointing out that the administrative panel considers only *contractual* criteria rather than applicable law); *American Girl, LLC v. Nameview, Inc.,* 381 F.Supp.2d 876, 883 (E.D. Wis. 2005) ("[A]ll registrants submit [to the UDRP] when they register a domain name with an ICANN-accredited registrar."). Therefore, absent the registration agreement, registrants such as

Defendant would have ***absolutely no obligation*** to participate in the UDRP process. No principles of international law, treaties, or federal law mandate a registrant's participation in this process. Only the registrants' agreement with the registrar (the Registration Agreement) binds the registrant to participate. Thus, contrary to what UCC suggests, the proper forum to reconsider a contractual UDRP decision would not be a court of limited jurisdiction such as a federal court, but a court of general jurisdiction, which would include the 95th District Court of Dallas County, Texas.  Further, as a third-party beneficiary of the contractual arrangement, UCC would have standing to bring suit in state court where the registrar or registry is located to enforce the UDRP decision, in the event that TIPA had not filed a lawsuit preventing transfer.

16.    UCC also attempts to argue that the UDRP should be the final word, which is a contention rejected by the Policy itself. By its plain terms, the UDRP permits judicial recourse before, during, and after a UDRP proceeding. Section 4(k) of the UDRP reads:

> Availability of Court Proceedings. The mandatory administrative proceeding requirements set forth in Paragraph 4 shall not prevent either you or the complainant from submitting the dispute to a court of competent jurisdiction for independent resolution before such mandatory administrative proceeding is commenced or after such proceeding in concluded.

(Appendix p. 43); *BroadBridge Media, LLC v. Hypercd.com,* 106 F.Supp.2d 505, 509 (S.D.N.Y. 2000) (citing Uniform Domain Name Dispute Resolution Policy 4(k)); see also *Parisi,* 139 F.Supp.2d at 751; *Dluhos v. Strasberg,* 321 F.3d 365, 372 (3rd Cir. 2003). Therefore, it makes sense and would follow that a party who can opt to proceed in district court at any time during a UDRP proceeding can obtain *de novo* judicial review following the proceeding. *Parisi,* 139 F.Supp.2d at 747; *Sallen v. Corinthians Licenciamentos LTDA,* 273 F.3d 14, 26 (1st Cir. 2001) (discussing the likelihood that the "judicial outcome will override the UDRP one").

17.    In this case, TIPA has chosen to file its challenge to the UDRP decision in the state court, which is the Mutual Jurisdiction consented to by both parties. TIPA has an absolute right to recourse to the courts to challenge any UDRP decision and any party filing a UDRP must consent to jurisdiction in Texas (because both the registrant and registrar reside in Texas). Apparently, not satisfied with results in

its many lawsuits in other jurisdiction, UCC has recently tried recasting cases as trademark disputes in order to file subsequent lawsuits in Indiana and request transfer of previously filed state court cases. *See eg. United Consumers Club v. Prime Time Marketing, Inc.,* (filing Indiana trademark action rather than raising issues in previously filed Ohio breach of contract action) (Appendix, pp. 282-283).   Had UCC wished to pursue a Lanham Act claim it could have filed in federal court originally; however, it chose to file a UDRP action, presumably in part because it has no evidence of actual infringement as it was well aware that a third party, Hitfarm, controls the content of the website, rather than TIPA. Instead, TIPA's only actionable conduct is the registration of the domain name <directbuymembers.com>. By filing the UDRP, as set out in TIPA's Motion to Remand, UCC invoked contract law principles governed by the laws of the State of Texas as opposed to the Lanham Act.

18.     The UDRP *permits* panelists to consider national law; however this is applied in an arbitrary manner and is not mandatory or controlling, due to the questionable language on this matter, as set forth in the UDRP rules:

> A Panel shall decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable.

UDRP Rule 15(a). Often, panelists bluntly refuse to apply U.S. trademark law, even in considering trademarks registered in the United States, as in this case:

> The Respondent argues that, in order to find confusing similarity, this Panel must consider factors that would be considered by a national court in a trademark infringement action.   Such is not the case.  It is well established that, under the Policy, a prima-facie comparison of the disputed domain name with the trademark suffices to establish confusing similarity.   As the Panel said in *Broadcom Corp. v. Becker,* FA 98819 (Nat. Arb. Forum Oct. 22, 2001), "The Respondent is under the mistaken impression that this Panel is bound by US trademark law when determining the issue of confusing similarity. Such is not the case.  Indeed Paragraph 15(a) of the Policy requires the Panel to: decide a complaint on the basis of … these Rules and any rules and principles of law that it deems applicable." That is, the Panel has broad latitude to adopt whatever criterion for confusion that it considers appropriate. Panels have consistently held that strict application of the confusion criteria arising out of national trademark laws is not appropriate, and that a broader notion of confusion should be used in these proceedings.

*America Online, Inc. v. Ian West d/b/a Art Of Living,* FA0602000638005 (NAF March 20, 2006)[10]. A different panel declined to transfer, when it expressly recognized that courts apply principles of trademark law, such as fair use and acquiescence that the UDRP does not envision or provide authority for panelists to consider:

> Under these circumstances and on this record, it cannot be concluded that Respondent has no "rights or legitimate interests" in the domain as is required under the Policy. While Respondent does not own MILITEC as a trademark, questions remain as to whether Complainant legally acquiesced in Respondent's registration and use of the domain, at least initially, or whether Respondent's use is a nominative fair use. Acquiescence and fair use are principles of trademark law, each requiring full analysis of the underlying facts. These are issues for the courts.

*Id.* WIPO panelists create their own body of precedent and controlling authority without regard to national law. In early 2005, WIPO launched an online digest system seeking to further this goal, announcing in its press release their intent to supersede national law:

> The rules governing the UDRP – whose popularity stems from its cost-effectiveness, the predictability of the process and swift enforcement of the results – are clear and concise. As a result, as the WIPO Overview shows, consensus or clear majority views have developed on most issues. However, with UDRP decisions covering a multitude of facts and arguments, it is hard to avoid genuine differences of opinion on some of the issues, all the more so in view of the fact that panelists and parties come from a multitude of jurisdictions.

"WIPO Offers New Tool For Analysis of UDRP Trends," (March 23, 2005).[11] Thus, a WIPO panel may elect to follow national law or precedent or something entirely else based on their personal whims. *Singapore Airlines Limited v. European Travel Network,* Case No. D2000-0641,[12] ("Although entitled to consider principles of law deemed applicable, the Panel finds it unnecessary to do so. The jurisprudence which is being rapidly developed by a wide variety of Panelists worldwide under the ICANN Policy provides a fruitful source of precedent.")

     19.    In a more recent UDRP case, the unequal application of the U.S. trademark law is apparent. In that case, a Canadian company asserted the existence of a U.S. trademark and, although the panelist denied the UDRP claim, it also refused to find reverse domain name hijacking largely because it

---

[10] http://domains.adrforum.com/domains/decisions/638005.html .
[11] http://www.wipo.int/edocs/prdocs/en/2005/wipo_upd_2005_246.html
[12] http://www.wipo.int/amc/en/domains/decisions/html/2000/d2000-0641.html

found that the "fair use doctrine" as recognized by the United States Supreme Court was not relevant, stating:

> The Panel does not doubt the relevance of this jurisprudence to any Court proceedings relating to the Complainant's trademarks. However, the Panel must operate within the Policy that simply requires a disputed domain name to be identical or confusingly similar to a mark in which a Complainant has rights.

*FabJob Inc. v. Compana LLC,* WIPO Case No. D2006-0610[13]. Panelists routinely dismiss such concerns with comments to the effect that if someone is unhappy with the UDRP outcome they can file in court, thereby elevating a desire to adhere to prior UDRP rulings rather than national law, as described by another panel:

> If such a consensus has emerged, panelists should endeavor to follow that consensus and thus promote consistent application of the UDRP. Such an approach is particularly appropriate in the context of the Policy. That is because UDRP decisions are not binding and non-appealable; rather, a losing party is free to pursue its claim in local courts. See Policy paragraph 4(k). Moreover, even if the consensus supports a decision that individuals believe to be wrong or bad policy, parties would at least know how such decisions would be decided under the Policy, and could elect instead to pursue their claims in court if they believed the judicial system would provide a more just result.

*Fresh Intellectual Properties, Inc. v. 800Network.com, Inc.,* Case No. D2005-0061[14] (citations omitted). One must question the validity of any quasi-legal system where the decision makers themselves don't respect the law enough to apply it. Therefore, as UDRP panels are not expected to respect legal authority, courts would be remiss in accepting their decisions based often on wholly foreign law or the panelists whim to be authoritative

which is not based upon and expressly disregards federal law.

     20.    Only by understanding this fundamental point can the court understand that this case is not an "anticipatory declaratory judgment action" regarding trademark infringement, but an action to redress the incorrect decision by a UDRP forum decided under the applicable contractual criteria. Contrary to UCC's rhetoric, filing these challenges to the UDRP in state court is more efficient and cost-effective for all parties than filing federal court actions. In fact, TIPA has already had one case go to a

---

[13] http://www.wipo.int/amc/en/domains/decisions/html/2006/d2006-0610.html
[14] http://www.wipo.int/amc/en/domains/decisions/html/2005/d2005-0061.html .

jury in Dallas County, resulting in a verdict overturning the UDRP ruling within approximately four months from the date suit was filed (Appendix, p. 129). Depending on the amount in controversy and remedy requested, TIPA may challenge these in any state court or if it wishes it could file in federal court. However, as a practical matter, federal courts have original jurisdiction to grant only limited relief to domain name holders. If TIPA filed in such an action in federal court, the federal court relief is limited to 15 U.S.C. § 1114(2)(D)(v) (which allows a domain name registrant whose domain name has been suspended, disabled, or transferred to file a civil action to establish that the registration or use of the domain name by such registrant is not unlawful) or seeking cancellation of the trademark under 15 U.S.C. § 1119.  In its Original Petition, TIPA did not seek to cancel UCC's trademark and, as the name has not actually been transferred to UCC due to the filing of a lawsuit, the issue is undecided in the Fifth Circuit as to whether TIPA would even have standing under 15 U.S.C. § 1114(2)(D)(v) to make a claim. *Mann v. AFN Investments, Ltd.,* 2007 WL 2177030 (S.D.Cal. 2007). In *Mann,* after losing the UDRP, the domain name registrant sued in federal court and the trademark holder moved to dismiss on the basis that it lacked standing because the domain name had not been "suspended, disabled or transferred" at the time suit was filed. *Id,* *2.  Noting that the Ninth Circuit had not reached the issue, the court looked to holdings of the First and Fourth Circuit and found there was standing, in part because the registrar at transferred the name to the court..

21.    Thus, TIPA's claims are not merely an "anticipatory declaratory judgment" anticipating UCC's counterclaims filed in Indiana. UCC's counter-claims could have been  be fairly raised in state court, as the Fifth Circuit has repeatedly held that Texas state courts are fully competent to rule upon trademark issues. *In re Hot-Hed Inc.,* 477 F.3d 320, 325-26 (5th Cir. 2007) (issuing mandamus reversing district court's denial of order to remand). Texas, like most states, has an extensive common law history of protecting property rights and contractual obligations, while considering the issues of trademark and other marks used in commerce, well prior to the enactment of the pertinent remedial provisions of the Lanham Act in 1947 and the growth of "federalized" trademark law in the 1970s. 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 1:17, 32:1; *Flagship Real Estate Corp. v. Flagship Banks,*

*Inc.,* 374 So.2d 1020, 1021, 204 U.S.P.Q. 227 (Fla.App., 1979).   In *Flagship,* the plaintiff real estate

company filed a declaratory judgment action in state court against a bank with a federally registered mark

using the word "flagship."   *Id.* The trial court dismissed the case for lack of subject matter jurisdiction,

but the appellate court reversed and remanded, finding that the state trial court has jurisdiction to hear a

state declaratory action regarding a federally registered mark. *Id.*   A state court can pass upon the validity

of federal trademark registration. *Brown & Bigelow v. Remembrance Advertising Products, Inc.,* 279 A.D.

410, 110 N.Y.S.2d 441, 92 U.S.P.Q. 443 (1952), *aff'd,* 304 N.Y. 909, 110 N.E.2d 736, 96 U.S.P.Q. 426

(1953).   Finally, state courts are fully capable of considering and granting relief under the

Anticybersquatting Consumer Protection Act (ACPA). *Nordic Inn Condominium Owners' Ass'n v.

Ventullo,* 151 N.H. 571, 864 A.2d 1079 (N.H. 2004). However, in this case, the Indiana action or its

threat, did not form the basis for any action taken by TIPA. Instead, TIPA sought a trial on the same

contractual issues raised in the original UDRP proceeding. Thus, TIPA seeks the broader relief. As a

result, abstention in favor of the subsequently filed Indiana action, which has no jurisdiction over either

TIPA or Mr. Dauben, is not warranted.

**B.      TIPA's Petition adequately states claims under state law.**

>      *i.      Dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or analogous Texas standards is not
>            favored.*

22.      Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is disfavored and rarely

granted. *Lowrey v. Texas A&M University System,* 117 F.3d 242, 247 (5th Cir. 1997).   The Federal Rules

"require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in

order to 'give the defendant fair notice of what the. . . claim is and the grounds upon which it rests.'" *Bell

Atlantic v. Twombly,* 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Under this standard, the complaint

must be liberally construed in favor of the party asserting the claim and all facts pled must be construed in

favor of the party pleading them. *Id.,* at 1965.

>      *ii.      Either Defendant's Motion to Dismiss or Notice of Removal is Frivolous*

23.      Six weeks ago, UCC removed this case from state court alleging that the Original Petition

presented a federal question on its face. Now, it alleges that the pleadings do not present a cognizable federal cause of action. It is axiomatic that a party cannot establish subject matter jurisdiction by disclaiming it. In this case, UCC has facts inconsistent with jurisdiction, but advocates that the Original Petition does not state a federal cause of action, a position that requires remand if accepted. 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject-matter jurisdiction, the case shall be remanded."); *Smallwood v. Illinois Central R.R. Co.,* 385 F.3d 568, *576* (5th Cir. 2002) (rejecting defendant's argument that court should dismiss outright a "meritless" case rather than remand to state court); *Herron v. Continental Airlines, Inc.,* 73 F.3d *57,* 60 (5th Cir. 1996) (because district court lacked subject matter jurisdiction over improperly removed state-law claims, it also lacked the power to dismiss those claims).   In *Bass v. Elliot,* after a New York state court granted a temporary restraining order against the defendant college, the college removed to federal court claiming jurisdiction under the Labor Management Relations Act. 71 F.R.D. 693 (E.D.N.Y. 1976) After removal, the college reversed position by filing an answer claiming a lack of subject matter jurisdiction. The court remanded and ordered payment of the plaintiff's just costs and attorneys' fees, holding:

> By its own argument, the college concedes that the sole purpose of removal to federal court was to have the federal court dismiss the case for want of jurisdiction. Such a frivolous, self-defeating invocation of federal procedure cannot be countenanced. The Court agrees with, and accepts the college's claim that there is no federal jurisdiction over this case. Accordingly, the Court finds pursuant to 28 U.S.C. 1447(b) that this case was removed by the college improvidently.

*Id.* at 694.

23.     Likewise in *Nurseminders of Elmwood Park, Inc. v. Metropolitan Life,* defendants removed by claiming diversity jurisdiction. 109 F.R.D. 4, 5 (N.D. Ill. 1985). Defendants then moved to dismiss, contending that a diversity-destroying party was indispensable under FED. R. CIV. P. 19. *Id.* Accepting defendants' contention that subject matter jurisdiction was absent, the court remanded and ordered defendant to pay plaintiff's costs, because the defendants removed this case when they knew or should have known that a party whose joinder would destroy diversity would be indispensable. *Id.*   UCC first claimed that the Petition supported removal jurisdiction, but now argues warrant dismissal for failing

to state a federal cause of action. Allegations supporting removal jurisdiction must be strictly construed, whereas as rules of pleading are still to be liberally construed. UCC cannot both meet its burden to demonstrate removal jurisdiction while attacking the sufficiency of Plaintiff's Original Petition.

        *iii.*     *Plaintiff's Petition states an actionable claim under Texas law.*

24.     In this case, Defendant has targeted the disputed domain name by making unwarranted claims to ownership, which is a matter well within the province of the Texas state courts to decide. Some jurisdictions have held that domain names are property. *Kremen v. Cohen,* 337 F.3d 1024 (9th Cir. 2003); *Mattel, Inc. vs. Barbie-Club.Com,* 310 F.3d 293, 300 fn. 7 (2nd Cir. 2002) (discussing cases and legislative history regarding Congress' intent to treat domain names as property); *In re Larry Koenig & Assoc.,* LLC, 2004 WL 3244582 (M.D.La. 2004) (finding domain name property of bankruptcy estate). Other courts have held that they are a contractual right arising out of the agreement between the registrant and the registrar. *Network Solutions, Inc. v. Umbro Intern., Inc.,* 259 Va. 759, 529 S.E.2d 80 (Va. 2000) (holding domain names could not be subject to garnishment by judgment creditor because were merely service contract between registrant and registrar). The court does not need to decide that issue, because there is a clear dispute between the parties which can be resolved by state law alone.

25.     Here, Defendant's course of action targets either property rights concerning intangible personal property situated in Texas or a contractual right arising between two Texas entities. Texas law provides causes of action concerning disputes that arise over the ownership of personal property where the rights of ownership arise by virtue of the property's transfer or possession in Texas. *Small v. Small,* 216 S.W.3d 872, 878 (Tex.App. – Beaumont 2007, n.p.h.); *Murray v. Murray,* 515 S.W.2d 387, 390-92 (Tex.Civ.App. – Waco 1974, no writ). This would include either tortuous interference with contractual rights or property rights, which contrary to UCC's arguments have not been expressly limited to real property rights. TIPA's Petition provides an adequate statement sufficient to establish review of the contractual criteria of the UDRP before a jury in the State Courts of Texas and if it does not state an adequate federal cause of action, the only remedy is remand rather than dismissal.

**C.      Venue is not proper in Indiana and the case should not be transferred.**

26.      "For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  The Court should consider various private and public interests in making its decision. *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004) (per curiam). The private concerns are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive. *Id.* The public concerns include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or the application of foreign law. *Id.* The moving party bears the burden of proving by a preponderance of the evidence that transfer is appropriate. *Bank One, N.A. v. Euro-Alamo Investments, Inc.,* 211 F.Supp.2d 808, 812 (N.D.Tex.2002).

27.      As a threshold matter, the language of Section 1404(a) requires the court to determine whether the proposed transferee district is one in which the suit might have been brought. *Illinois Union Insurance Company v. Tri Core Inc.,* 191 F.Supp.2d 794, 797 (N.D.Tex.2002); *Eastman Medical Products, Inc. v. E.R. Squibb & Sons, Inc.,* 199 F.Supp.2d 590, 595-96 (N.D.Tex.2002). In this case, UCC has not suggested how TIPA, which is not registered to do business in Indiana, could have brought an action challenging the UDRP decision under Texas state law in the Northern District of Indiana.

28.      Additionally, both parties have agreed to a "Mutual Jurisdiction" under the contractual terms of the UDRP proceeding. Complainants like UCC must anticipate and submit to such court challenges when filing UDRP Complaints. UCC agreed to Mutual Jurisdiction to any challenge regarding this domain name in its UDRP complaint, stating:

**VIII. MUTUAL JURISDICTION**

43. In accordance with Paragraph 3(b)(xiii) of the Rules, Complainant agrees to submit, only with respect to any challenge that may be made by Respondent to a decision by the Administrative Panel to transfer or cancel the Domain Name [<directbuymembers.com>]

subject to this complaint, to the jurisdiction of the courts in the location of the Registrar BudgetNames.com's office in Texas.

(Appendix pp. 98-99, ¶ 43). Forum selection clauses specifying a mandatory venue for the litigation of a dispute "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.,* 92 S.Ct. 1907, 1913 (1972). The presence of a forum selection clause is "a significant factor that figures centrally in the district court's calculus." *Stewart Org., Inc. v. Ricoh Corp.,* 108 S.Ct. 2239, 2245 (1988). Thus, in this sense both UCC, by filing the UDRP complaint submitting to jurisdiction in Texas, and TIPA have chosen Texas as their forum state to resolve this dispute. According to UCC's filing in its Indiana action last month, "a forum selection clause should control unless there is a strong showing that it should be set aside. (Appendix, p. 285).

22.     In this case, whether it proceeds under the ACPA or the contractual elements of the UDRP claim, the central issue is not the strength of UCC's mark in Indiana, but the subjective and objective bad faith of TIPA in registering and using the disputed domain name. There is no dispute that TIPA is based solely in Texas and its principal has never been to Indiana (Appendix, pp. 2-3). The key witnesses and testimony in this case will have to be developed by consumer survey studies to determine, whether consumers in this region treat "direct buy" as a generic or descriptive term or as a unique source identifier for UCC's goods and services. *Security Center, Ltd. v. First Nat'l Security Centers,* 750 F.2d 1295, 1301 (5th Cir. 1985) (*quoting Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 795 (5th Cir. 1983) (survey evidence critical). Furthermore, TIPA is entitled to establish its good faith belief by obtaining the testimony from the more than twenty other businesses in Texas that use "direct buy" or a substantially similar name for a tradename or trademark, such as Buy Direct Transmission and Buy Direct Furniture (Appendix, pp. 319-321). While UCC operates eight locations and a portion of these may be affiliates, the unrelated third parties cannot be compelled to come to Indiana to testify on TIPA's behalf. The witnesses listed by UCC are not strictly necessary in regards to the claim advanced by Plaintiff and are all employees or agents of UCC and of whom UCC will be able to compel attendance. Furthermore,

as UCC argued in its UDRP action, it began its marketing campaign in Dallas and claims to any awareness of its mark on the part of TIPA must be based solely on its marketing efforts in Dallas (Appendix pp. 119-120). Finally, any records relating to this registration of this domain name would be in the possession of BudgetNames.com, which is based in Texas.

23.    Indeed, any order of this court affecting this domain name would have to be directed toward the registrar or registry, which is why Congress in enacting the in rem provisions of the ACPA made jurisdiction mandatory where the domain name registrar or registry is based. *Goldstein v. Gordon,* 2002 WL 324289, *3 (N.D.Tex. 2002) (setting aside default *in rem* award of domain name and issuing sanctions against plaintiff for filing in Texas rather than in Virginia where registrar was based).  As the case load of the two courts appear relatively balanced, and there is no indication of congestion, Congressional intent that actions relating to domain names should be predicated on the registrar or registry location should be given sufficient weight under the public factors analysis. Furthermore, as UCC has repeatedly pointed out, TIPA has filed several lawsuits in state court recently. While one has gone to trial, the others are currently pending. Therefore, the interests of consistency and local interest would weigh in favor of keeping these cases in the same district, in order to avoid conflicting rulings and ensure a forum familiar with the applicable law.

## IV. CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff TIPA prays that the Court deny the Motion to Dismiss or to Transfer Venue, and provide such other relief to Defendants as may be appropriate.

Respectfully submitted,

*/s/ Daniel G. Altman*
**Daniel G. Altman**
Texas Bar No. 00793255
SHRULL ALTMAN LLP
1701 River Run Drive, Suite 1116
Fort Worth, Texas 76107
(817) 336-3925
(871) 336-2124 (Fax)
danaltmanlaw@gmail.com

**Attorney for Defendants**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiff's Response to Motion to Dismiss or Transfer Venue was served on December 6, 2007 on the following counsel of record in the manner shown below:

**VIA ECF and ELECTRONIC MAIL:**
James R. Nelson
DLA Piper US LLP
1717 Main Street, Suite 4600
Dallas, Texas 75201

Attorneys for Defendant

/s/ Daniel G. Altman
Daniel G. Altman